Richard SIMMONS, Leon Wallace, Jr., Charles Dawson, Ricardo Bryant, Lucion Bradley, Jr., James W. Knight, Samuel Coakley, James Johnson, William S. H. Davis, David L. Gadsden, Jasper L. Walker, John H. Poole, John Henry Deas, and Charles Swinton, Plaintiffs,

v.

SOUTH CAROLINA STATE PORTS AUTHORITY, W. W. Johnson, James C. Hair, Jr., Joseph P. Riley, James C. Todd, James B. Moore, Harold E. Trask, John T. Welch, Jr., and W. Don Welch, Defendants.

Civ. A. No. 76–2307.

United States District Court,
D. South Carolina,
Charleston Division.

July 30, 1980.

Armand Derfner, Arthur McFarland, Charleston, S.C., for plaintiffs.

James B. Spears, Jr., Greenville, S.C, Neil C. Robinson, Jr., Charleston, S.C., for defendants.

## ORDER

BLATT, District Judge.

## BACKGROUND

Plaintiffs and the class of black current and former employees they represent con-tend that the Defendant, South Carolina State Ports Authority—(hereinafter, "Ports Authority")—has discriminated against them on the basis of race in the denial of certain retirement rights and benefits which are based on periods of their previous employment service prior to July 30, 1969. This suit was instituted on December 3, 1976, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. § 1981 and § 1983.

On June 26, 1978, the Ports Authority moved for summary judgment regarding the retirement—(or pension)—claims on the grounds, inter alia, that any such claims are jurisdictionally barred from being litigated by the applicable statutes of limitations. Plaintiffs opposed defendant's motion on the grounds that defendant's discrimination is continuous in nature and, therefore, has been timely challenged. The summary judgment motion, based on the record in the case, was argued before the court on October 23, 1979.

Plaintiffs are current employees and one former employee—(retired)—of the Ports Authority. The first of fourteen (14) administrative charges of employment discrimination, upon which plaintiffs' Title VII claims are based, was filed under the statutory provisions of Title VII with the Equal Employment Opportunity Commission—(EEOC)—in Atlanta in August, 1975.

The South Carolina Retirement System—(hereinafter, "Retirement System")—which is not a party to this lawsuit, is an independent State agency established under the *Code of Laws of South Carolina, 1976* § 9–1–10, et seq.[1] The Retirement System is under control of the State Budget and Control Board, and it is the sole administrator of retirement allowances and other related benefits for employees of the State who work for various state agencies or de-

---

1. Defendants claim that the Retirement System is an indispensable party at least for the purpose of any remedy which might be ordered in this action. After oral argument on defendant's motion on October 23, 1979, the court granted plaintiffs thirty (30) days in which to amend their complaint, if they so chose, to include the Retirement System, or to take any additional measures regarding the motion. Plaintiffs, thereafter, did not amend the complaint nor seek to supplement the record in any manner.

partments. An employee is enrolled in the Retirement System through his employer by executing a Retirement System form. Such employee then participates in the Retirement System by making his own contribution through payroll deductions, with an employer contribution also being made on his or her behalf. These monetary contributions are periodically transmitted pursuant to State statute to the Retirement System by each State agency or department. Upon retirement, an employee's retirement benefits are calculated by the Retirement System based on a statutory formula, one factor of which is the employee's length of service as a State employee. Finally, the Retirement System Board is under a statutory obligation to correct errors in the records of employee members or beneficiaries. *Code of Laws of South Carolina, 1976*, § 9–1–1670.[2]

The defendant Ports Authority is a state agency established and operating pursuant to South Carolina law. *Code of Laws of South Carolina, 1976*, § 54–3–10, *et seq.* The individually named defendants are either present or past members of the Ports Authority's Board of Directors, and the Ports Authority's current Executive Director. Prior to July 30, 1969, the Ports Authority maintained dual employment classifications of "temporary" and "permanent"—(or "regular")—employees. "Temporary" employees were hired primarily for the job positions of cargo handler and forklift operator due to the fluctuation of the work load experienced by the Ports Authority. This "temporary" classification was comprised predominantly, but not exclusively, of black employees. Some blacks classified as "temporary" employees remained so classified for longer periods of time than similarly classified white employees.[3] As long as an employee was classified as "temporary", the Ports Authority did not enroll him in the Retirement System. Once any employee, black or white, became classified as a "permanent", or "regular", employee, he was enrolled in, and began participating in, the Retirement System.

On July 30, 1969, the Ports Authority reclassified all employees into an entirely new employment classification system. The result of this reclassification was that all employees who had been earlier classified as "temporary" were given "permanent" status if they had worked at the Ports Authority for at least the immediately preceding sixty (60) days.[4] Thus, plaintiffs and other class members were immediately enrolled in, and began participating in, the Retirement System no later than July 30, 1969. No employee, black or white, categorized in a "temporary" classification before July 30, 1969, has received retroactive retirement service credit for the period of time he was so classified prior to July 30, 1969. Employees with pre-July 30, 1969, employment service in a "temporary" classification have retired at various times both before July 30, 1969, and up to the present time. There are current employees of the Ports Authority who have worked in a "temporary" status prior to 1969, and who will receive no retirement credit for their

---

2. Code of Laws of South Carolina, 1976, § 9–1–1670, states as follows:

Should any change or error in the records result in any member or beneficiary receiving from the System more or less than he would have been entitled to receive had the records been correct, the Board shall correct such error and, as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such member or beneficiary was correctly entitled shall be paid.

3. Plaintiffs suggest that an "adverse impact" analysis under *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), somehow strengthens their opposition to defendants' motion. However, the *Griggs* "ad-

verse impact" analysis requires a timely challenged employment practice which "operate[s] to 'freeze' the status quo of prior discriminatory employment practices." *Id.* at 430, 91 S.Ct. at 853. Therefore, absent a current or existing employment practice which has been timely challenged, the *Griggs* "adverse impact" analysis fails. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

4. Although the Ports Authority continued to use a "temporary" classification after July 30, 1969, this new employment status relates only to the period of actual temporary employment —[normally no more than thirty (30) days]— and has no relation to the retirement service credits challenged by plaintiffs' claims in this case.

periods of temporary employment service when and if they retire as Ports Authority employees.

Plaintiffs maintain that the employees who were classified by the Ports Authority as "temporary" were actually members of the South Carolina Retirement System from their first dates of employment and that the Ports Authority intentionally discriminated against black employees by not allowing them, prior to July 30, 1969, to become enrolled in the Retirement System. Thus, plaintiffs claim that this earlier, intentional discrimination has continued against black employees as a group by preventing them from receiving retirement credits based on their total employment service since their original dates of hire. However, plaintiffs do not contend that black employees have been discriminatorily classified by the defendants for purposes of retirement credits at any time since July 30, 1969. Similarly, there is no claim that there has been any discriminatory enrollment in the South Carolina Retirement System at any time since July 30, 1969, or that there has been any other differential treatment—(including correction of retirement records)—between blacks and whites with regard to retirement credits based on pre-July 30, 1969, employment service.

Plaintiffs seek as a remedy an equitable adjustment of class members' retirement records to reflect such person's original hire date for retirement credit purposes. Plaintiffs also seek an equitable seniority adjustment in class members' retirement credits—(presumably by the Retirement System)—and necessary backpay from defendants to remedy any alleged deficiencies in retirement checks which have been previously issued based on employment service periods which excluded pre-July 30, 1969, "temporary" employment.

■ Under Title VII, a plaintiff may not bring suit in a district court unless a charge has been filed with the Equal Employment Opportunity Commission within 180 days of the occurrence of the alleged unfair practice. 42 U.S.C. § 2000e–5(e). Any failure to comply with this statute deprives a district court of subject matter jurisdiction.

*United Air Lines, Inc. v. Evans*, 431 U.S. 553, 554–55, 97 S.Ct. 1885, 1887, 52 L.Ed.2d 571 (1977); *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *cf., Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924 (5th Cir. 1975).

■ 42 U.S.C. §§ 1981 and 1983 have been recognized as creating a cause of action for employment discrimination. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Acha v. Beame*, 438 F.Supp. 70, 77 (S.D.N.Y.1977), *affirmed*, 570 F.2d 57 (2nd Cir. 1978). Since these statutes provide no period of limitations, it is necessary to refer to the appropriate period established by state statute. This court held in *Lewis v. Bloomsburg Mills, Inc.*, 8 FEP Cases 742 (D.S.C.1974), that Section 1981, which preserves the right to make and enforce contracts, is most analogous to an action to enforce a contract right, and that the six (6) year South Carolina statute of limitations for contract actions should apply to Section 1981 suits. The Fourth Circuit Court of Appeals has analogized Section 1983 to a tort action, saying "In essence, § 1983 creates a cause of action where there has been injury, under color of state law, to the person or to the constitutional or federal statutory rights which emanate from or are guaranteed to the person. In the broad sense, every cause of action under § 1983 which is well-founded results from 'personal injuries.'" *Almond v. Kent*, 459 F.2d 200 (4th Cir. 1972). This court is of the opinion, therefore, that the appropriate limitation period for a Section 1983 suit is six (6) years, which is the period in South Carolina applicable to actions for "any . . . injury to the person or rights of another, not arising on contract . . . ," South Carolina Code of Laws § 15–3–530.

The Ports Authority maintains that plaintiffs have challenged only the residual effects of alleged prior discriminatory acts, such acts having all occurred beyond the aforementioned statutory limitations periods. The Ports Authority bases its position on the United States Supreme Court's deci-

sion in *United Air Lines, Inc. v. Evans, supra.* Evans was employed by United as a flight attendant from November, 1966, to February, 1968, at which time she married and was forced to resign because United refused to employ married female flight attendants—(this policy was subsequently found to violate Title VII of the Civil Rights Act of 1964). Evans was rehired in February, 1972, and in 1973 she filed charges under Title VII with the EEOC, claiming that United had committed an unlawful employment practice by refusing to credit her with seniority for any period prior to February, 1972. No discrimination charge had been filed with the EEOC within the appropriate time period after the plaintiff was forced to resign in 1968.

The sole question for decision by the Supreme Court in *Evans* was whether United had committed a second violation of Title VII by refusing to credit the plaintiff with seniority for any period prior to February, 1972. Evans argued, *inter alia*, that United's seniority system illegally discriminated against her in that it gave present effect to a past illegal act and, therefore, perpetuated the consequence of forbidden discrimination.

The Supreme Court, through Justice Stevens, agreed with Evans that United's seniority system gave present effect to a past act of discrimination, but it held that such an act of discrimination must have been the basis of a timely charge before any court could adjudicate the question of remedy. The Supreme Court said:

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

*Id.,* 431 U.S. at 558, 97 S.Ct. at 1889.

The Supreme Court continued:

> Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists. She has not alleged that the system discriminates against former female employees or that it treats former employees who were discharged for a discriminatory reason any differently than former employees who resigned or were discharged for a non-discriminatory reason. In short, the system is neutral in its operation.

*Id.* at 558, 97 S.Ct. at 1889.

The Ports Authority asserts that the Retirement System is neutral in its operation and any reduction in plaintiffs' benefits is, at best, only the "effects" of its prior "temporary" classifications which plaintiffs allege were discriminatory prior to July 30, 1969.

Plaintiffs propose two legal theories to establish the timeliness of their discrimination claims. First, plaintiffs contend that notwithstanding the pre-July 30, 1969, discrimination against blacks classified as "temporary", this earlier discrimination continues for purposes of retirement credits until the time of actual retirement by each black employee. In other words, plaintiffs claim that a continuing violation exists since each class member fails to receive as much in retirement credits or pension payments as he would have received if he had not been victimized by defendants' discriminatory pre-July 30, 1969, classification practices. This theory is based on plaintiffs' claim that the precise amount of retirement benefits are not definitely determinable until actual retirement; thus, plaintiffs assert that they have timely challenged the illegal discrimination. Secondly, plaintiffs claim that there exists a statutory obligation on the part of defendants to correct the erroneous records which reflect the pre-July 30, 1969, "temporary" employment service of plaintiffs and their class. Plaintiffs assert that this is a separate violation of a continuing statutory obligation with the monetary consequences not being determinable until actual retirement; therefore, plain-

tiffs claim that this violation may be timely challenged up to and including retirement of each class member.

## RESOLUTION OF CLAIMS

### A. *Title VII*

The discrimination claimed by plaintiffs as to their retirement credits arises by virtue of the pre-July 30, 1969, classification of black employees as "temporary" by the Ports Authority. Plaintiffs do not disagree with this factual analysis.[5] They do not contend that the South Carolina Retirement System treats them any differently than whites who have the same credits as plaintiffs upon retirement. Plaintiffs seek neither modification in or elimination of the Retirement System itself; rather, they seek increases in retirement credits and the resulting increases in pension which they would have received had the Ports Authority not discriminated in its pre-July 30, 1969, classification practices. According to plaintiffs, the defendant's practice of classifying them as "temporary" rather than "permanent" employees and failing to make monetary contribution in their behalf to the South Carolina Retirement System during the pre-July 30, 1969, period is the discriminatory conduct on which their Title VII challenge—(as well as Sections 1981 and 1983 claims hereinafter discussed)—is based. The plaintiffs, having admitted that all such discriminatory acts ceased no later than July 30, 1969, can recover only if this conduct, with its alleged present-day impact, constitutes a continuing violation of either Title VII or Sections 1981 and 1983, and the applicable statutes of limitations, therefore, do not commence until benefits become payable under the pension plan. For an excellent analysis of this continuing violation theory, see *The Continuing Violation Theory of Title VII After United Air Lines, Inc. v. Evans*, 31 Hastings L.J. 929 (1980).

The plaintiffs' continuing violation theory is based on the fact that the pension plan penalizes employees who should have been, but were not, given "permanent" classification when they began their employment with the Ports Authority. However, it appears to be well settled that any loss of retirement benefits due to such conduct on the part of the defendants is no more than the present or future effect of a past act of discrimination. While the result may be harsh, it is mandated by the time limits set in Title VII and the ruling of the Supreme Court in *Evans, supra*. This court is of the opinion that the entire Retirement System, at least since July 30, 1969, has been neutral in operation just as was the seniority system in *Evans*, and that the plaintiffs cannot equate the decrease in pension benefits, regardless of when they become vested, with a present unlawful employment practice.

> [A] challenge to a neutral system may not be predicated on the mere fact that a past event which has no present legal significance has affected the [past] calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer. *Evans, supra*, at 560, 97 S.Ct. at 1890.

Since the plaintiffs failed to timely challenge the allegedly unlawful classification practice itself, they cannot now challenge its derivative effects. Upon retirement, plaintiffs are treated like any other employee who was assigned to "temporary employment" service prior to July 30, 1969. A neutral retirement system cannot alone constitute a present discriminatory practice. To be subject to challenge, a race-neutral retirement system must be accompanied by a timely-challenged discriminatory practice which has an adverse effect on the retirement status of a class of employees. *Alston v. Allegheny Ludlum Steel Corp.*, 465 F.Supp. 171 (W.D.Pa.1978). The *Alston* case presented a factual background and legal issues essentially identical to the instant case. In *Alston*, the plaintiff claimed that defendant maintained racially discrimi-

---

**5.** Plaintiffs state in their Memorandum in Opposition to Defendant's Motion for Summary Judgment that:

> The pension issue in this case arises from the Ports Authority's practice from its beginning in 1945 through July 30, 1969, of classifying all or virtually all black employees as "temporary" . . .

natory promotion practices and a racially discriminatory pension system. The plaintiff asserted that, due to defendant's discriminatory failure to earlier promote him, his later retirement benefits were reduced; Alston, therefore, maintained that the pension plan's benefits were discriminatorily awarded. The court initially addressed the promotion practice and found it to be untimely challenged. The court next turned to Alston's pension claim, pointing out first that Alston had made no allegations that the pension system itself discriminated against blacks, or that it treated him any differently than whites. The court then noted that, like plaintiffs here, Alston did not seek either to modify or eliminate the pension system itself; he sought only to obtain additional compensation from the pension system because of the earlier promotions he was allegedly denied due to his race. The court concluded that the pension system was race neutral and, as such, was essentially like the neutral seniority system in *Evans*; thus, the court held that Alston's reduced pension benefits could not serve as a basis for his otherwise time-barred claim of promotion discrimination. *See also Trabucco v. Delta Airlines*, 590 F.2d 315 (6th Cir. 1979) (reaching a similar result where the alleged continuing violation was a reduction in pay and fringe benefits due to lost seniority).

As was Chief Judge Northrop of the District of Maryland in the case of *International Brotherhood of Electrical Workers, Local 805, AFL–CIO v. Westinghouse Electric Corporation*, 20 E.P.D. ¶ 30,082 (D.C.Md. 1979), this court is of the opinion that the plaintiffs' retirement claims are identical in all material respects to the seniority claims in *Evans*. Cf. *Wood v. Southwestern Bell Telephone Co.*, 442 F.Supp. 41 (E.D.Mo. 1977), *rev'd on other grounds*, 580 F.2d 339 (8th Cir. 1978)—(finding no theoretical dis-

tinction between the effects of past discriminatory training and the loss of seniority in *Evans*.) To impose liability upon the defendants for additional contributions to the Retirement System at this time, which contributions plaintiffs claim should have been made well prior to March 24, 1972, when Title VII first became applicable to the defendants, would be imposing a remedy for acts which preceded the time when these defendants were covered by Title VII.[6] The grant of such a remedy would, in this court's opinion, be extending judicial relief well beyond the intended reach of Title VII.[7] The Ports Authority cannot now be required by this court to remedy discriminatory actions under Title VII which occurred in their entirety prior to the application of that statute to the Ports Authority. *Farris v. Board of Education of St. Louis*, 576 F.2d 765 (8th Cir. 1978). As the court said in *Freude v. Bell Telephone Company*, 438 F.Supp. 1059 (E.D.Pa.1977), when presented with a very similar claim:

> [I]t is plain that the basic holding of *Evans* is that a current nondiscriminatory policy will not revive a time-barred act of discrimination even though such policy gives present effect to the past act of discrimination.

▇▇▇▇ In addition to their continuing violation theory, plaintiffs also, as heretofore stated, advance the theory that the statute of limitations on a pension claim does not begin to run until the employee becomes eligible for immediate payments. Like Chief Judge Northrop in *Electrical Workers, supra*, and Judge Becker in *Freude, supra*, this court is unable to distinguish between seniority credits and pension credits for purposes of Title VII. Although in some contexts the statute of limitations may not begin to run until retirement benefits become payable, *see Davis v. Alabama*

---

6. Title VII of the Civil Rights Act of 1964 did not apply to state agencies, such as the Ports Authority, until March 24, 1972. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1979).

7. The United States Supreme Court has considered claims of discriminatory pension benefits—(and the contributions that maintain

them)—to be claims for "compensation" under Title VII. *City of Los Angeles v. Manhart*, 435 U.S. 702, 712, n.23, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978); therefore, plaintiffs here are seeking an award of backpay "compensation" under Title VII for a period of time which entirely predates Title VII's application to the Ports Authority in 1972.

*Power Company,* 383 F.Supp. 880, 893 (N.D. Ala.1974), *aff'd per curiam,* 542 F.2d 650 (5th Cir. 1976), *aff'd,* 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977) (certiorari limited to other grounds, 431 U.S. at 583 n.5), in the employment discrimination context, retirement benefit claims are subject to the same limitations as are other seniority claims under *Evans.* The *Davis* case, *supra,* interpreted a federal statute which required that a covered employer's seniority plan give credit for time an employee spent in military service. That statute is specifically addressed to the benefits to be awarded to retired employees. Title VII and Sections 1981 and 1983, by contrast, require no such provisions in a retirement system; rather, they require only that employees be treated in a nondiscriminatory manner. In discrimination cases, therefore, *Evans* mandates that the statute of limitations run from the time of the act of alleged discrimination. *International Brotherhood of Electrical Workers, etc. v. Westinghouse Electric Corp., supra.*

### B. *Claims under 42 U.S.C., Sections 1981 and 1983.*

■ Plaintiffs additionally allege causes of action under 42 U.S.C., Sections 1981 and 1983, for discriminatory conduct prior to July 30, 1969, based on the action of the defendants in placing them in "temporary" jobs. It has been held that Sections 1981 and 1983 provide remedies which are "separate, distinct, and independent"[8] from those provided under Title VII. However, it appears that the logic of *Evans* as applied to Title VII claims would be equally applicable to claims under Section 1981 and Section 1983, and that such claims would survive under Section 1981 or Section 1983 only if they are not barred by South Carolina's six-year statute of limitations, which this court has hereinabove held applicable

to the claims under these two statutes. While this court has not uncovered in its research a case in the Fourth Circuit specifically equating Section 1983 with Title VII as *Johnson v. Ryder Truck Lines,* 575 F.2d 471 (4th Cir. 1978), *cert. denied,* 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979),[9] equates Section 1981 with Title VII, this court feels that the policy underlying the operation of the statute of limitations is equally applicable to Section 1983. *Gill v. Monroe County Department of Social Services,* 79 F.R.D. 316, 333 (W.D.N.Y.1978). Under neither of these statutes is there a legal obligation on the part of the defendants to take affirmative action to rectify the continuing effects of past discrimination. As the court recognized in *Fitzgerald v. Seamans,* 553 F.2d 220, 230 (D.C.Cir. 1977), "the mere failure to right a wrong and make plaintiff whole cannot be a continuing wrong which tolls the statute of limitations, for that is the purpose of any lawsuit and the exceptions would obliterate the rule."

■ Based on the foregoing, this court has concluded that plaintiffs' Section 1981 and Section 1983 claims are barred by the six-year South Carolina Statute of Limitations, since the alleged discriminatory employment practices, the defendants' refusal to grant the plaintiffs "permanent" employment status for retirement credit purposes, occurred prior to July 30, 1969, more than seven (7) years before such practices were challenged in December, 1976, by the filing of this suit. To award the requested remedies now under these two statutes would result in plaintiffs' "bootstrapping" otherwise time-barred claims well beyond the statute of limitations period, a result that would defeat the limitations period and its underlying equities, as well as undermine the policy that the Supreme Court has expressed towards the continuing violation

---

8. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). *See also Acha v. Beame,* 438 F.Supp. 70, 77 (S.D.N.Y.1977), *affirmed,* 570 F.2d 57 (2nd Cir. 1978) (regarding 42 U.S.C. § 1983).

9. *Accord, Martin v. Georgia-Pacific Corporation,* 568 F.2d 58 (8th Cir. 1977).

theory of employment discrimination in *Evans, supra.*

## C.  Correction of Records

■ The *Code of Laws of South Carolina, 1976,* § 9–1–1670, requires that correct records regarding retirement benefits be maintained by the South Carolina Retirement System. (*See* footnote 2, *supra.*) Plaintiffs contend that this statutory provision obligates the Ports Authority to correct erroneous records which reflect the pre-July 30, 1969, allegedly discriminatory classification practices of the Ports Authority. Plaintiffs claim that such correction— (along with commensurate monetary contributions by the Ports Authority)—would restore to them retirement credits which should have been granted for the pre-July 30, 1969, period. Plaintiffs assert that this obligation is continuing, with the monetary consequences not determinable until actual retirement. Plaintiffs, therefore, contend that the present claims based upon this obligation are timely. However, the court finds this argument unpersuasive for several reasons.

Section 9–1–1670 is not addressed to the Ports Authority. That statute is found under provisions governing the South Carolina Retirement System. *See Code of Laws of South Carolina, 1976,* § 9–1–10 *et seq.* The obligation to correct erroneous records is that of the Retirement System's Board alone. Nothing within this statute creates any obligation to correct erroneous records on the part of any participating state agency, such as the Ports Authority. Therefore, the statutory obligation to correct erroneous retirement records is that of the State Retirement System and not the Ports Authority.[10]

Even if, as plaintiffs allege, the Ports Authority was under an obligation to correct erroneous retirement records, plaintiffs fail to allege that there has been any discriminatory correction of erroneous records at any time. Under *Evans, supra,* for a claim to exist in this regard, there must have been a *discriminatory* correction of erroneous records at some time within the period of limitations; that is, white employees classified as "temporary" must have had this same "error" corrected, while black employees similarly classified did not have their records corrected. Plaintiffs do not allege that any such action has taken place. Quite to the contrary, plaintiffs concede that there has been no differential treatment between former "temporary" black and white employees by the Ports Authority with regard to retirement credits since 1969, based on either "pre" or "post" July 30, 1969, employment service.[11] Therefore, there are no allegations which would support a claim that the Ports Authority has acted in a discriminatory manner in correcting or failing to correct erroneous records of employees.

## CONCLUSION

In accordance with the foregoing, this court hereby grants defendant's motion for summary judgment as to plaintiffs' retirement claims alleging violations of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983.

AND IT IS SO ORDERED.

■

---

**10.** Again, it should be noted that plaintiffs have chosen not to include the State Retirement System in this case. *See* footnote 1, *supra.*

**11.** The uncontradicted affidavit of Robert A. Loy, Executive Assistant-Employee Relations for the Ports Authority, establishes this significant fact.